IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RONALD A. GATES AND CATHERINE    )
T. GATES,    )
              Plaintiffs,    )
    )
        v.    )    C.A. 07-104 E
    )
EXCO RESOURCES (PA), INC.,    )
    )
              Defendant.    )

## OPINION

COHILL, S. D.J.

## I.   BACKGROUND

Plaintiffs Ronald A. Gates and Catherine T. Gates, who own a dairy farm in Corry,

Pennsylvania, filed a complaint in this action on May 9, 2007, seeking compensation for property

damage, as well as unpaid taxes and royalties from defendant EXCO-Resources (PA), Inc.

("EXCO"), to which the Gates had leased portions of their property to install gas wells and

transmission lines.

The plaintiffs seek compensation for several alleged breaches of agreements by EXCO.

They allege that EXCO has failed to restore their property to its original condition, thereby

reducing their property's value, and further, they seek compensation for royalties which they

allegedly lost as a result of installation of a gas compressor station.  Plaintiffs seek an accounting

for such unpaid royalties.  Plaintiffs also allege that EXCO has not paid a royalty on gas not used

by them, as well as a fee for the installation of certain transmission lines.  In addition, they

1

contend that EXCO owes back taxes on a compressor station building for the years 2006 through 2009.

The parties consented to a non-jury trial.  On August 17, 2009 the Court and counsel viewed the subject property.  Our impressions of the property will be noted herein where appropriate.

The next day, on August 18, 2009, we conducted a one-day bench trial.  Plaintiffs called two witnesses to the stand: 1) Plaintiff Ronald Gates; and 2) Raleigh Chesley, plaintiffs' expert witness on the appraisal of farmland.  Defendant called three witnesses to the stand: 1) Adam Vincent, an EXCO employee and "land man" familiar with the corporate recordkeeping; 2) James Bourbeau, an independent petroleum "land man" who performed leasing services for the defendant from 2000 to 2005; and 3) Joseph Schwab, construction superintendent for EXCO.

At the court's request, the parties submitted post-trial proposed Findings of Fact and Conclusions of Law, as well as responses thereto.

In accordance with Fed. R. Civ. P. 52(a), we make the following Findings of Fact and Conclusions of Law.

## II.   **FINDINGS OF FACT**

1.     The plaintiffs, Ronald A. Gates and Catherine T. Gates ("the Gates"), are husband and wife residing at 21167 Lindsey Hollow Road, Corry, Pennsylvania, 16407.

2.     Defendant EXCO Resources (PA), Inc. ("EXCO")[1] is a corporation organized and

---

[1]On June 20, 2008, the original named Defendant, North Coast Energy, Inc. changed its name to EXCO-North Coast Energy, Inc.; on December 1, 2009, EXCO-North Coast Energy, Inc. changed its name to EXCO-Resources (PA), Inc.

existing under the laws of the State of Delaware, with its principal place of business being located in Akron, Ohio.

3.      The Gates own three contiguous parcels of land in Concord Township, Erie County, Pennsylvania, which is near the city of Corry, Pennsylvania. One of those parcels consists of 100 acres of land, another parcel contains approximately 75 acres, and the final parcel consists of 25 acres. Their residence is located on the 100-acre parcel of land. See generally, Pls.' Exhibit 4 (Ronald A. Gates' handwritten drawing (not to scale)).

4.      The 100- and 75-acre parcels (collectively, "the Subject Property" or "the 175-acre parcel") lie to the east of Lindsey Hollow Road, with that road forming its western border. The 25-acre parcel lies immediately east of the 75-acre parcel and is contiguous with it. The 100 acre parcel is immediately south of the 75-acre parcel and is contiguous with it.

5.      The 25-acre parcel is wooded, while approximately 115 acres of the other 175 acres are wooded. Thus, about 60 acres (minus the area occupied by the residence and outbuildings) are devoted to pasture for a 100-head herd of dairy cows. Crops have not been grown since 1985.

6.      Portions of the Gates' property were passed down from generation to generation; some sections owned by the Gates family as far back as 1862.

7.      Ronald Gates began grazing cattle and producing dairy milk in early 1963; his father had been doing the same since the 1940's.

8.      Prior to any formal relationship between the parties, the Subject Property was converted from tillable land to pasture land to support plaintiffs' approximately 100 dairy cows.

9.      It is necessary to mow pasture land in order to keep the weeds (and other plants which cows will not eat) from going to seed.

3

10.  Once converted to pasture land, and prior to any formal relationship between the parties, Mr. Gates was able to mow the pasture without difficulty, but for an occasional swampy area.

11.     There is a small pond on the Subject Property.

12.     Prior to 1998, the Gates had entered into some agreements whereby they had granted permission to EXCO and other gas companies to drill for gas on the Subject Property; by their terms, these leases (not at issue in this litigation) expired due to lack of drilling.

13.     In addition, in 1983 Columbia Gas was granted a 50 foot right of way for a transmission line to pass through the Gates' property along the electric line on the property.

### The 1998 Oil and Gas Lease and Wells No. 1, 2, and 3

14.     In 1998, Mr. Gates was approached by David Stevens from EXCO, who expressed the company's interest in leasing for the drilling of gas wells.

15.     The Gates, as lessors, entered into an Oil and Gas Lease (the "Agreement") (Pls.'s Ex. 1) with defendant EXCO, as lessee, on February 18, 1998 with respect to the 100 and 75-acre parcel (hereinafter, "the 175-acre parcel"). The Agreement granted EXCO, the lessee, the right to remove oil and gas from the 175-acre parcel and an easement over the surface of the 175-acre parcel to do so.

16.     Mr. Gates testified that he carefully reviewed the contract terms and made numerous changes to the standard leasing agreement prior to signing the document; for example, he asked that the lease have a 3 year limit, rather than a 10 year limit (see paragraph 2), and furthermore, he requested that EXCO pay him the appropriate fee two years in advance.

17.     The Agreement (Plaintiffs' Ex. 1) contained a number of covenants.

        a.      At paragraph 1, plaintiffs drew a line through the form lease the phrase "without

4

the payment of additional consideration pursuant to attendant pipeline-right-of-way grant(s);"
thus, according to plaintiffs, plaintiffs wanted to ensure that defendant could not lay additional
pipe, service and/or transmission lines to transport gas from other wells onto the 175 acres
without the payment of additional consideration.

      b.      At paragraph 4(B), EXCO agreed to pay plaintiffs a royalty for "the gas marketed
and used off the premises" from each well drilled on the Subject Property. The royalty was to be
one-eighth the price paid to the defendant per thousand cubic feet of such gas.

      c.      At paragraph 14 of the Agreement and at the sixth paragraph of the Addendum,
(also dated February 18, 1998 and part of Plaintiffs' Exhibit 1),  EXCO agreed to reclaim the
Subject Property "in accordance with state laws" to "as near normal condition as possible within
six (6) months after completion of work on said well, weather permitting."

      d.      At paragraph 6, plaintiffs were permitted to lay a pipeline to their house or their
daughter's adjoining property; the first 300,000 cubic feet of gas taken each year was to be free
of cost.

      e.      At its Addendum, the Agreement provides that "all pipelines shall be buried at
least thirty-six (36) inches below the surface of the ground." Mr. Gates insisted on the inclusion
of this provision based on his experience with another party, Columbia Gas, whose agreement
stipulated that a pipeline be buried 4 feet so as not to interfere with the appropriate plow depth.

18.      The first well was not drilled until February or March 2001.

19.      Prior to that time, on December 1, 2000 the Gates also executed an Affidavit of
Noncompliance which was recorded with the Erie County Recorder of Deeds and which
indicated that no oil or gas production had occurred on the property "for a long period of time, if

5

ever," but that the February 18, 1998 Oil and Gas Lease with EXCO remained in full force and effect.

20.     There are three gas wells on the 175 Subject Property, named Well No.1, Well No. 2, and Well No. 3, which were drilled in reverse numerical order.

        a. Well No. 3 was drilled in the southeast corner of the parcel in late February or early March 2001;   Wells No. 1 and 2 were drilled in November-December 2001.

        b. Well No. 1 was drilled in the northeast corner of the parcel and Well No. 2 in the approximate center of the parcel. See Pls.' Ex. 4 ("X" marks).

### The 25 Acre Parcel

21.     In order to connect the three wells, EXCO and the Gates' entered into an agreement dated August 24, 2000 – a Pipeline Right of Way – which granted EXCO an easement to install a transmission line over the 25-acre parcel ("the 25-acre transmission line"), not from the compressor to the meter station on the 175 acre property (which later occurred by other means), but over the back portion of the farm – the 25-acre parcel. Def.'s Ex. C (unrecorded) and D (dated December 1, 2000) (recorded).

22.     The gas from the three wells was transported over the 25 acre parcel and into an offsite meter station, from November 2001 through September 2002, without incident.

23.     The 25 acre transmission line is depicted in red on plaintiffs' Exhibit 4, and runs from well No. 3 to Well No. 2 to Well No. 1 and then over the 25 acre parcel and apparently, into the "Gibas" property.

24.     The 25 acre transmission line is not at issue in this case.

25.     As per the terms of the Pipeline Right-of-Way, the defendant agreed to and in fact, did

6

pay the plaintiffs $5.00 per rod for this transmission line. Plaintiffs were fully compensated for
the approximately 300 rods used to install the transmission line.

26.     Mr. Gates testified that EXCO did a "good job" in laying and installing the 25 acre-
transmission line, which was buried at least 36 inches below the surface of the ground;
furthermore, the ground was returned to the condition it was in prior to the installation of the
transmission line.

27.     For the period of time from November 2001 through September 2002, the three wells
were producing roughly two to four million cubic feet of gas per month and the Gates were
receiving royalties totaling approximately two to three dollars per thousand cubic feet.

### Compressor Station in 2002

27.     Beginning in September of 2002, EXCO expressed a desire to construct a compressor
station on the Subject Property. This would compress gas collected from Wells No. 1, 2, and 3,
as well as other wells drilled in the surrounding area. It would then transmit the collected gas to
a meter station which would be placed by the defendant on the Subject Property

28.     On February 16, 2001, the Gates signed an Extension of Oil and Gas Lease, extending
the February 18, 1998 lease to EXCO for a period of six weeks "and as long thereafter as oil and
gas (including casing head gas) is produced from any well on the land covered by [the] lease."

29.     On September 10, 2002 the Gates executed an easement to allow EXCO to install a
compressor on the 175-acre parcel. (Def.'s Ex. "A" and "G")

30.     The fourth paragraph of the September 10, 2002 easement provides that EXCO "shall
only have such obligations with respect to maintaining this easement as may be required by any
and all applicable laws and regulations . . ."

7

31.     At the time, plaintiffs did not know that EXCO would use gas from the three wells to run the compressor; however, plaintiffs believed that they would receive a royalty for the gas used to operate the compressor station. Timothy Silker and David Stevens, both agents and/or employees of EXCO, represented to the plaintiffs that this would be the case.

32.     However, when the compressor station became operational, there was a decrease in the amount of royalty payments; production dropped by nearly fifty percent, even though the representatives from EXCO had predicted to the Gates' that their production would increase by fifty percent.

33.     A meter station was installed on the 175-acre parcel in November-December of 2001; a compressor was installed on the same parcel in September of 2002.

        a. The compressor is located in the northern portion of the 175-acre parcel (marked "COMPRESSOR" on Pls.' Ex. 4).

        b. The meter station is located in the southwest corner, near Lindsey Hollow Road. (marked "METER" on Pls.' Ex. 4).

34.     On December 12, 2002 EXCO and the Gates signed an agreement to the effect that EXCO would pay the Gates $1,000 each year for the compressor Easement, due on January 1 of each year.  The $1,000 per year rental payment has been made each year since the granting of the compressor station easement, although some payments were late.

35.     Therefore, initially, when the parties first entered into their contractual relationship, the gas went from the wells through a pipeline that left the 175-acre parcel in its northeast corner and moved across the 25-acre parcel to a meter northeast of the 25-acre parcel.

36.     In late 2002 or early 2003 this was changed: the gas from the wells on the 175-acre

8

parcel owned by the Gates was moved through a pipeline to the compressor on 175-acre parcel along with gas from parcels of land owned by persons other than Mr. and Mrs. Gates, then through another pipeline to the meter station, which was also on the 175-acre parcel.

37.     The function served by the compressor has been to increase the pressure of the gas to enable its transmission to the facilities of a third party for sale by EXCO to that third party, while the function served by the meter station has been to measure the quantity of gas sold to the third party by EXCO.

**Permission to Lay Additional Transmission Lines**

38.     EXCO needed a transmission line over the subject property which would transmit the compressed gas collected from the three wells (in addition to approximately 67 other wells located elsewhere in their system).

39.     EXCO relies upon the legal force of two alleged easements, purportedly signed by plaintiffs[2] in December 2000: an easement purportedly granted by the Gates in a document entitled Pipeline Right of Way dated December 1, 2000 (Defendant's Exhibit "E") and another dated December 11, 2000 (Defendant's Exhibit "F").

40.     According to plaintiffs, these two alleged easements are not enforceable contracts for the following reasons:

a. When James Bourbeau, an independent land man, arrived at the Gates' residence with a copy of Defendant's Exhibit E, in late 2000 (prior to when the wells were drilled), plaintiffs refused to sign this alleged agreement because:

---

[2] Both Plaintiffs' signatures appear on both these exhibits; Mr. Gates denied these were his signatures. Mrs. Gates did not testify. Of course, it would have been helpful to have an expert analyze them for accuracy.

9

i) insofar as the gas would (as believed at that time) be transmitted over the 25 acre parcel, there would instead be an easement to do so[3]; and

ii) the draft easement (Exhibit E) contained the wrong property description (naming the location as "Spring Creek Township, Warren County" rather than the correct location, "Concord Township, Erie County."

b. Mr. Gates testified that on or about November 25, 2000, Mr. Bourbeau arrived a second time with Defendant's Exhibit F, which plaintiffs refused to sign because they believed there was no reason to sign it, as previously explained.

c. Plaintiff's version of defendant's Exhibits E and F are unsigned, and at some point unknown, Mr. Gates wrote on both of them: "THIS DOCUMENT IS A FORGERY. WE DID NOT SIGN ANYTHING FOR JIM BOURBEAU." Pls.' Exhibit 3.

d. Mr. Adam Vincent could not explain why these two alleged agreements would be necessary for the same easement, nor could he explain why one was dated December 1, 2000 and another, December 11, 2000.

e. Mr. Vincent also could not explain why both agreements, despite being dated ten days apart, were recorded at the Recorder of Deeds of Erie County eight months apart.

42.    Mr. Gates testified, with a great degree of credibility, that he never signed Exhibits E and F; his signature appears on the documents but he explained that he was taught to sign his name

_____

[3] The February 18, 1998 Oil and Gas Lease with respect to the 175-acre parcel, for example, provides that the lease is for "drilling" etc. for gas and conducting "such secondary or tertiary operations as may be required . . . and to transport by pipelines or otherwise across and through said lands . . . gas . . . from the subject and other lands...and of placing tanks, equipment, roads and structures thereon to procure and operate for said products. . . ."

"on the line" not above it.

43.     Mr. Gates was a credible witness with a sharp memory; he remembered in great detail each and every one of his interactions with representatives of EXCO and all of the events described herein.

44.     Plastic transmission lines were installed between April and September of 2002.

45.     The plastic line was laid 36 inches deep, but its installation disrupted underground drainage and, according to the plaintiffs, defendant did not clean up or remove any stones from the disrupted area.

46.     EXCO later determined that the plastic line was not strong enough to transmit the compressed gas, and therefore, in April 2003, EXCO laid a second transmission line made of steel, again relying upon the allegedly forged easements.

        a.  The plastic and steel pipelines were installed at different locations, "a couple hundred feet" apart at times, but approximately 100 feet apart most of their course; the steel line was west of the plastic line.

        b.  The plastic line ran for a time through the wooded part of the Subject Property, while the steel line ran through the pasture.

        c.  The areas disturbed by the excavation necessary to install the lines are between 12 and 16 feet wide; there are two such strips on the property.

        d.  One of the lines runs on one side of the pond, in the woods, and the other runs on the other side of the pond, in the pasture.

47.     The plaintiffs contend that EXCO improperly laid a plastic transmission line from the compressor station to the meter station, even though the defendant should have known that

11

defendant's Exhibits "E" and "F" were forgeries and that plaintiffs had expressly stated in the Agreement that if defendant wanted to lay transmission lines that carried gas from other wells, defendant had to compensate plaintiffs.

48.     According to Mr. Gates, EXCO damaged drain tile, did not reconnect the drain tile, failed to lay the steel pipe 36 inches deep, and failed to remove all of the rocks that were strewn about in installing both the plastic line and the steel line.

    a.     After completion of the installation of the pipelines on the Gates' property, plastic drains were installed by EXCO at locations where there had been damage to the drain tiles which has been located on the Gates property before EXCO installed the pipelines.

    b.     The court observed a small amount of standing water, unwanted thistle, an enlarged swampy area, and numerous rocks which we assume were included in the fill used by EXCO after the transmission lines were installed.

    c.     Although there are some drainage problems on the Gates property at the present time, notably, near the access road on the north portion of the property on the way to the compressor site, it is not exactly clear to what extent these are attributable to the operations of EXCO.

**Roads**

49.     EXCO built two access roads and a dirt tractor road on the subject property in order to allow it to serve the compressor and three wells.

50.     An access road surfaced with gravel was constructed by EXCO and serves the compressor and Well No. 1, situated between Lindsey Hollow Road and those two installations, traveling east-west ("north access road") (marked with a grey line and small x's on Pls.'s Ex. 4)

12

51.     EXCO built a second access road of the same nature, which serves Well No. 3, traveling

east-west from the Meter station area next to Lindsey Hollow Road east to Well No. 3 (south

access road")(also marked with a grey line and small x's on Pls.'s Ex. 4).

52.     A third dirt road starts about midway on the length of the north  access road  to the

compressor and Well No. 1 and travels (parallel to Lindsey Hollow Road) southwardly to Well

No. 2.

### Other matters

53.  On January 24, 2003 the Gates signed a "Houseline" release of EXCO relative to the

installation of a pipeline to a house owned by them, located on the premises, which pipeline was

to enable them to receive gas from the wells on the premises with no cost to them.

### Failure to Pay Five Dollars Per Rod

54.     The August 24, 2000 and December 1, 2000 Pipeline Rights of Way relative to the 25-

acre parcel provided for the payment of "$5.00 per line rod, to be paid before such grant shall be

used or occupied," for "the right to lay pipelines over and through the premises."  Def.'s Ex. C

and D.

55.     Similarly, the December 1, 2000 and December 11, 2000 Pipeline rights of Way relative

to the 175-acre parcel provide for the payment of $1.00 "and Five Dollars ($5.00) per line rod, to

be paid before such grant shall be used or occupied," for "the right to lay pipelines over and

through the premises."  Def.'s Ex. E and F.

56.      On May 6, 2002 EXCO sent a check to the Gates in the amount of $1,187.27 for the two

Pipeline Rights of Way; $238.00 was allocated to the 25-acre parcel and $949.27 to the 175-acre

parcel.   Def.'s Ex. H.  Defendants claim that the $947.27 was payment for the installation of the

13

plastic and steel pipelines from the compressor to the meter.

    a.  According to the plaintiffs, however, "although the easements relied upon by the defendant to lay said lines were never signed by plaintiffs the easements nonetheless called for the defendant to play [sic] plaintiffs $5.00 per rod used.   The total amount of rods for the two lines is approximately 320 rods. Accordingly, the plaintiffs are owed $1,600 for the rods laid for the aforementioned transmission lines."  Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. 42) at 8 (citations omitted).[4]

    b.  Adam Vincent, defendant's agent, testified that the payment could not have been for the plastic and steel transmission lines and in fact, plaintiffs were not paid for the five dollars per rod for either the plastic pipe or steel line.

    c. This payment predates the installation of the compressor and the plastic and steel lines and therefore, could not have been payment for them.

    d. In all likelihood, this payment was for the original line, denoted in red on Plaintiff's Exhibit 1.

**Damages**

### A. Unpaid taxes

57.    The defendant does not dispute that it must pay the real estate taxes which have been assessed against the compressor station building for the tax years 2006, 2008 and 2009. See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law (Doc. 43) at 3.

    a. Adam Vincent testified on behalf of the defendant that the defendant has failed to pay the plaintiffs the real estate taxes associated with the compressor station building for calendar

---

    [4] We note that this is the rate ($5.00 per rod) required by the Agreement as well.

14

years 2006, 2008 and 2009, although the defendant had paid the real estate taxes in 2004 and 2005.

b. There is no evidence indicating whether Mr. Gates notified EXCO of the amount of the 2006 taxes; on advice of counsel he did not cash a check sent to him for the 2007 taxes and it appears he did not notify EXCO of the amounts due and owing for the 2008 and 2009 taxes.

c. The trial in this matter has put EXCO on notice of the amount of taxes in 2006 through 2009 and those taxes have not been paid.

d. The total tax owed is $868.36 ($217.09 x 4 years).

### B. Property Reclamation

58. Various agreements are cited by the Plaintiffs in support of their claim that the defendants should return the Subject Property to the condition it was in prior to the installation of the wells and transmission lines.

a. Paragraph 14 of the February 18, 1998 Oil and Gas Lease provides that "[EXCO] agrees to restore the premises in accordance with state laws."

b. The fifth paragraph of the December 11, 2000 Pipeline Right of Way provides that EXCO "will pay damages which may arise to crops and fences from the laying, maintaining, operating and final removing of [the] pipelines... ."

c. The fourth paragraph of the September 10, 2002 Easement provides that EXCO "shall only have such obligations with respect to maintaining this easement as may be required by any and all applicable laws and regulations. . . ."

59. Prior to the commencement of EXCO's operations, there were portions of the 75 acres in pasture which could not be mowed because there were swampy areas; for example, the area south

15

of the access road to the compressor station.  This area remains swampy but is deeper.

60.    Mr. Schwab visited the Subject Property at Mr. Gates' request and inspected the property

for alleged drainage problems.  Drain tiles were reconnected when found, and French drains were

placed in the Steel pipeline excavation, in addition to a small spur from the steel pipe excavation

to a dry ditch.

61.    The plaintiffs had an expert report submitted by Raleigh J. Chesley of Chesley

Auctioneers.

      a.    In his report, he stated that 50 of the 75 acres of open rolling land were affected by

the underground drilling operation.

      b.    He also said that EXCO damaged drain tiles, created roadways, and failed to

replace the land into the condition it was which was to be used as crop land.

      c.    According to Chesley, 25-30 acres no longer tillable (because of the disruption of

underground farm tiling or tunneling) and this decreased the value by $400.00 per acre, or

between $10,000 to $12,500.

      d.    Approximately 20 acres is considered useless now, even as pasture land, which

amounts to $16,000 in damage ($800.00 per acre).

      e.    He concluded his expert report with certainty that the property can never be

repaired to be used as tillable land, and the cost of reparation would far outweigh the lessening of

the property value.

      f.    Consequently, Mr. Chesley opined that plaintiffs should be awarded between

$26,000 to $28,500 for loss of property value.

      g.    For the most part, however, the land was restored to its previous condition after

16

the completion of the installation of the pipelines and after EXCO made certain corrections. However, Mr. Gates testified as to certain damage to the property as a result of poor drainage, for example, in the area around the pond, he can no longer drive a mower over because the water level was raised, as well as other areas where the drain tiles were damaged.

       h.     The defendant's expert, Joseph Schwab, filed a written expert report and testified that he had served as the EXCO pipeline supervisor on the Gates' property. He stated that Mr. Gates showed him areas on the subject property which had damaged clay field tile which occurred before EXCO installed the wells. Schwab opined that some areas not disturbed by EXCO contained more moisture than others and were comparable to those areas disturbed by EXCO. Mr. Schwab concluded that any alleged damage could be rectified by installing drain pipe to reduce the moisture in the soil. However, drain pipe installation is unnecessary to use the land for pasture or crops.

## C. Lost Royalties

62.     The plaintiffs contend that the operation of the compressor station has caused them to realize a noticeable loss in the royalties – approximately 50 percent of the amount they were previously receiving from the gas generated by the three wells on the Subject Property.

63.     Gas has been and is used to operate the compressor, some of which is from the EXCO wells on the Gates property and some is from EXCO wells located on the land of others.

64.     Paragraph 4(B) of the February 18, 1998 Gas and Oil Lease states that a royalty will be paid "for the gas marketed and used off the premises."

65.     According to EXCO, gas used to run the compressor is not marketed and used off the premises, and therefore, no royalty is due the plaintiffs.

17

66.     Paragraph 6 of the February 18, 1998 Oil and Gas lease provides in part that:

The Lessor may, at Lessor's sole risk and cost, lay a pipeline to any gas well on
the premises or the adjoining property presently owned by Loretta M. Gates and
take gas produced from said well for domestic use in dwelling house (sic) on the
leased premises, at Lessor's own risk, subject to the use and the right of the
abandonment of the well by the Lessee, and subject to any curtailments or shut-in
by any purchaser of the gas. **The first three hundred thousand cubic feet of gas
taken each year shall be free of cost, but all gas in excess of three hundred
thousand cubic feet of gas taken each year shall be paid for at the last
premises or the field market rate, whichever is higher**. Lessor to lay and
maintain the pipeline and furnish regulators and other necessary equipment at
Lessor's expense. Lessor shall also, at the request of the Lessee, install a meter to
measure said gas. This privilege is upon the condition precedent that the Lessor
shall subscribe to and be bound by the reasonable rules and regulations of the
Lessee relating to the use of free gas, and Lessor shall maintain the said pipeline,
regulators and equipment in good repair and free of all gas leaks and operate the
same so as not to cause waste or unnecessary leaks of gas.

67.     Some of the gas not used by the Gates is used to operate the compressor and some is

marketed by EXCO.

68.     Paragraph 15 of the Agreement provides that "[t]he Lessee shall have the privilege of

using sufficient . . . gas . . . for operating the premises . . ." Pls.' Ex. 1.

69.     According to EXCO, under paragraph 6 of the February 18, 1998 Oil and Gas Lease, the

Gates are entitled to up to 300,000 cubic feet of gas each year at no cost to them, but they are not

entitled to be paid for gas not used by them, except to the extent that they are entitled to a royalty

on gas "marketed and used off the premises" by EXCO.

70.     The Agreement pre-dates the installation of the compressor station.

71.     Mr. Gates testified that EXCO representatives told him that he would be compensated for

the gas that would be used to operate the compressor station. Plaintiffs have demanded an

accounting of the gas used by the compressor station and thereafter, the appropriate amount of

18

royalties they are due and owing from the gas used to operate the compressor station.

### D.  Lawn Mower

72.      Mr. Gates testified that he sustained damage to his mower of approximately $1,000.00 as a result of mowing the Subject Property and striking rocks strewn about along the areas where the plastic and steel transmission lines were laid; his testimony is the only evidence of this alleged damage.

### E.  Extension

73.      Plaintiffs claim that they were not paid the $1.00 consideration called for in the Extension of Oil and Gas Lease (dated February 16, 2001,extending the Agreement). Pls.' Ex. 2.

74.       The Extension of Oil and Gas lease states that it is granted "for and in consideration of One Dollar, in hand paid, the receipt whereof is hereby acknowledged."

### F.  Meter Station

75.      The plaintiffs claim that they should be paid for the land that the meter station occupies.

76.      According to EXCO, the provisions of the December 11, 2000 Pipeline Right of Way and the provisions of the February 18, 1998 Oil and Gas Lease authorized EXCO to install the meter station on the 175-acre parcel.  Moreover, all payments due with respect to those two payments have been made by EXCO to the Gates.  Therefore, the Gates are not entitled to any award of damages relating to the installation of the meter station.


## III.  CONCLUSIONS OF LAW

Plaintiffs Ronald A. and Catherine T. Gates are citizens of the Commonwealth of Pennsylvania. Defendant EXCO Energy, Inc. is a citizen of the States of Delaware and Ohio.

19

The amount in controversy in this action exceeds the sum of $75,000, exclusive of interest and costs. This court therefore has original jurisdiction of this action, since the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and it is between citizens of different States. 28 U.S.C. § 1332(a).

Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." Ware v. Rodale Press, Inc.,322 F.3d 218, 225 -226 (3d Cir. 2003), citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999). To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a "reasonable certainty." ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 668 (3d Cir.1998). "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." Id. at 669 (quoting Spang & Co. v. United States Steel Corp., 519 Pa. 14, 545 A.2d 861, 866 (1988).

The plaintiff bears the burden of proof as to damages, and the question of damages may not be submitted to a fact-finder if a plaintiff fails to meet the burden. Vrabel v. Commonwealth, 84 A.2d 585 (Pa. Cmwlth. 2004). Yet if the facts afford a reasonably fair basis for calculating how much a plaintiff may be entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation. Kaczkowski v. Bolubasz, 421 A.2d 1027, 1030 (Pa. 1980).

At the outset, we note that the defendant does not dispute that it owes plaintiffs $868.36 in unpaid taxes which have been assessed against the compressor station building for tax years

20

2006 through 2009.  An appropriate order will be entered.

As for royalties on the gas taken from wells on their property and used to operate the compressor, we agree with EXCO that the Gates are not entitled to the payment of such royalties. Paragraph 4(B) of the February 18, 1998 Oil and Gas Lease (the legal enforceability of which plaintiffs do not dispute) states that a royalty will be paid "for the gas marketed and used off the premises." We find that common sense and the plain meaning of these words dictate a conclusion that gas used to operate the compressor is not "gas marketed and used off the premises."  Mr. Gates claims that he was told that the compressor would increase production and therefore, increase the amount of royalties they would receive; such extraneous evidence must be disregarded.  Where the contract or agreement is unambiguous, parole evidence of prior inconsistent terms or negotiations is inadmissible to demonstrate intent of the parties. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1010 (3d Cir.1980). A contract is ambiguous if, after hearing evidence presented by the parties, the court determines that objective indicia exist to support the view that the "terms of the contract are susceptible of different meanings." Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir.1993).  Furthermore, we note that the Agreement states that "this instrument contains and expresses all of the agreements and understandings of the parties in regard to the subject matter thereof;" the easement to allow EXCO to install the compressor states that "[t]his agreement embodies all of the understandings and promises of the parties and there is not any contrary or additional understanding that shall survive the execution of this document." Def.'s Ex. A.  Moreover, the provisions of paragraph 6 of the Agreement (which addresses the Gates' right to three hundred thousand cubic feet of gas each year at no cost to

21

them) does not entitle them to be paid for gas not used by them (except to the extent that they are entitled to a royalty on gas "marketed and used off the premises" by EXCO, which we have found does not apply to the operation of the compressor). This provision says nothing about paying them for any unused gas. We therefore also find that the Gates are not entitled to an accounting of royalties to which they have no legal right.

With respect to the plaintiff's claim that they are entitled to $1,000 for the damage to their mower, the only evidence of such damage is the testimony of Ronald Gates. He stated that if he hits a rock with the mower, it will result in a "thousand dollar repair bill." We will find in favor of the defendant with respect to these alleged damages because Mr. Gates has not provided a receipt for a repair bill or other such documentation sufficient to meet his burden of proving damages. Although Mr. Gates was credible, he appeared to be speculating.

We find that the evidence that the Pipeline Rights of Way were forged (Def.'s Ex. E and F) was insufficient to meet plaintiff's heightened burden, see De Lage Landen Fin. Serv. Inc. v. Urban Partnership, 903 A.2d 586 590 (Pa. Super. 2006), although the facts and circumstances around their alleged execution are suspicious. Nevertheless, it is clear that the Gates were not paid the requisite and customary $5.00 per rod. The total amount of rods for the two lines is approximately 320 rods. Accordingly, the plaintiffs are owed $1,600 for the rods laid for the aforementioned transmission lines.

With respect to plaintiff's claim that they are entitled to $1.00 consideration called for in the Extension of Oil and Gas Lease, we find in favor of the defendants. The third paragraph of the February 16, 2001 Extension of Oil and Gas lease clearly states that it is granted "for and in consideration of One Dollar, in hand paid, the receipt whereof is hereby acknowledged." We did not find Mr. Gates' testimony that he had not been paid the $1.00 to be credible.

22

The Plaintiffs argue that they should be compensated for the land that the meter station occupies, but have not met their burden by showing they did not grant permission, nor have they shown what value we should attribute to any such lost "damages." Even so, we find that in the December 11, 2000 Pipeline Right of Way plaintiff clearly granted EXCO permission "to install, maintain, operate, repair, replace and remove meters and meter runs for measurement of gas from adjoining and adjacent lands." Def.'s Ex. E and F. In the alternative, we note that the Agreement provides that the lease is for "drilling" etc. for gas and conducting "such secondary or tertiary operations as may be required . . . and to transport by pipelines or otherwise across and through said lands . . . gas . . . from the subject and other lands...and of placing tanks, equipment, roads and structures thereon to procure and operate for said products. . . ."

Plaintiffs claim that EXCO has not returned the Subject Property to the condition that it was in prior to the laying of the plastic and steel lines running from the compressor station to the meter station. It is clear that rocks in the area near the service lines have prevented Mr. Gates from mowing, and that tile drains were damaged; these occurrences, in turn, have rendered certain areas incapable of being returned to pasture land. (No crops were being grown on the parcels in the question during the time EXCO has had easement over those parcels to conduct oil and gas production operations and, therefore, the Gates are not entitled to recover damages for any crop damage.) EXCO has an obligation independent of the Pennsylvania Oil and Gas Act to restore the Gates' land to its previous condition after the completion of the installation of the pipelines, given its obligation "to repair and maintain the portions of the servient estate and the improvements used in the enjoyment of the servitude that are under the beneficiary's control, to the extent necessary to...prevent unreasonable interference with the enjoyment of the servient

23

estate." Restatement (Third) of Property: Servitudes  § 4.13; Ephrata Area School District v. County of Lancaster, 886 A.2d 1169 (Pa. Cmwlth. 2005).  We agree with a portion of Raleigh Chesley's opinion, approximately 20 acres of the Subject Property were rendered almost unable to be used again, thereby decreasing the value of each acre by $800 each, for a total of $16,000.00.  According to Mr. Chesley, this amount of damage is typical of any gas production operation because of the construction of roads and well sites.  Defendants take that estimate to mean that the plaintiff's cannot therefore recover for these typical losses; we find that his opinion lends credence to the accuracy of plaintiff's loss computation.

However, we do not agree that another 25-30 acres has been reduced in value from $1,200.00 per acre to $800.00 per acre due to the damage to drain tile.  Mr Schwab visited the Subject property in April 2003 and inspected the wet spots on the property that were allegedly the result of damaged drain tile.  EXCO laid French drains in portions of the steel pipeline excavation, and a small spur was installed.  We note that even today, there are wet areas where EXCO has not performed any work, and there are wet areas where EXCO had performed work. Our inspection of the property does not align with Mr. Chesley's estimates of the amount of acres affected (an amount he obtained from Mr. Gates) (we saw very minimal damage), and to find otherwise would be speculation on our part.

An appropriate Order will be entered.

Date: *April 8, 2010*                                  *Maurice B. Cohill, Jr.*
                                                      Maurice B. Cohill, Jr.
                                                      Senior United States District Court Judge


cc: record counsel

24